UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDEN GULLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Kathleen Cardone |
| | ) | |
| CHICAGO STATE UNIVERSITY by and through the Board of Trustees (in their official and individual capacities); | ) ) ) | Case No. 3:20-cv-00114-KC |
| | ) | |
| ZALDWAYNAKA SCOTT, in her official and individual capacity; | ) ) | **PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| | ) | |
| MATTHEW FETE, in his official and individual capacity; | ) ) | |
| | ) | |
| ANTOINE JENKINS, in his official and individual capacity; | ) ) | |
| | ) | |
| VICKY SHAH, in his official and individual capacity; | ) ) | |
| | ) | |
| LALITA PRASAD-REDDY, in her official and individual capacity; | ) ) | |
| | ) | |
| ALLISON ROSE, in her official and individual capacity; and | ) ) | |
| | ) | |
| MOHAMMAD NEWAZ in his official and individual capacity, | ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, BRANDEN GULLA, by and through his attorney, Joseph Cannizzo Jr., Esq. of

Lento Law Group, P.C., brings this action for damages and other legal and equitable relief against

Defendants CHICAGO STATE UNIVERSITY, ZALDWAYNAKA SCOTT, MATTHEW FETE,

ANTOINE JENKINS, VICKY SHAH, LALITA PRASAD-REDDY, ALLISON ROSE, and MOHAMMAD NEWAZ (collectively, the "Defendants"), alleging as follows:

## INTRODUCTION

1.      In short, this matter arises from Plaintiff's wrongful dismissal from Chicago State University – a dismissal that was precipitated by a pattern and practice of unprofessional, negligent, and otherwise tortious conduct on the part of Chicago State University and its staff, and which was also occasioned by an arbitrarily hostile and capricious educational environment which served only to exacerbate Plaintiff's diagnosed disability.

## JURISDICTION AND VENUE

2.      This Court has original subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (federal question) & 1343.

3.      This is an action for damages in vindication of Plaintiff's civil rights secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

4.      This action also arises under the Americans with Disabilities Act of 1990 (ADA), Pub.L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101 *et seq.*, amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, at Title II of the ADA, prohibits discrimination on the basis of disability in the provision of public services, and Section 202 of the Act, 42 U.S.C. §12132 (Supp.1991), the Rehabilitation Act of 1973, §§504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA. Both the ADA and §504 prohibit discrimination and retaliation against persons with disabilities.

5.     This Court also has supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367(a), as such claims are so related to Plaintiff's federal claims that they form part of the same case or controversy and arise out of a common nucleus of operative fact.

6.     Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

## PARTIES

7.     At all times relevant hereto, Plaintiff BRANDEN GULLA, is an adult resident citizen of the County of Oakland, State of Michigan, and is a former student of Chicago State University's College of Pharmacy.

8.     At all times relevant hereto, Defendant CHICAGO STATE UNIVERSITY ("CSU") is a public university and recipient of federal funds, located at 9501 S. King Drive, Chicago, IL 60628.

9.     CSU is governed through its Board of Trustees, whose primary office is located at 9501 S. King Drive, Cook Admin Room 300, Chicago, IL 60628, and whose primary contact is non-party Teresa L. Bates.

10.     At all times relevant hereto, Defendant ZALDWAYNAKA SCOTT ("Scott") is the President of CSU, and said Defendant acted under color of state law at all times herein complained of. Upon information and belief, Defendant Scott has a residential address for service of process believed to be 10400 S. Longwood Drive, Chicago, IL 60643.

11.     At all times relevant hereto, Defendant MATTHEW FETE ("Fete") is the Dean of the College of Pharmacy at CSU, and said Defendant acted under color of state law at all times herein complained of. Upon information and belief, Defendant Fete has a residential address for service of process believed to be 7180 Mount Sherman Road, #20, Longmont, CO 80503.

12.     At all times relevant hereto, Defendant ANTOINE JENKINS ("Jenkins") is a professor within the College of Pharmacy at CSU, and is thereby an employee, agent, and/or workman, or CSU. Upon information and belief, Defendant Jenkins has a residential address for service of process believed to be 177 Buttercup Lane, Dyer, IN 46311.

13.     At all times relevant hereto, Defendant VICKY SHAH ("Shah") is a professor within the College of Pharmacy at CSU, and is thereby an employee, agent, and/or workman, or CSU. Upon information and belief, Defendant Shah has a residential address for service of process believed to be 1505 Yellowstone Drive, Streamwood, IL 60107.

14.     At all times relevant hereto, Defendant LALITA PRASAD-REDDY ("Prasad-Reddy") is an Assistant Dean and professor within the College of Pharmacy at CSU, and is thereby an employee, agent, and/or workman, or CSU. Upon information and belief, Defendant Prasad-Reddy has a residential address for service of process believed to be 2448 W. Ohio Street, Chicago, IL 60612.

15.     At all times relevant hereto, Defendant ALLISON ROSE ("Rose") is a professor within the College of Pharmacy at CSU, and is thereby an employee, agent, and/or workman, or CSU. Upon information and belief, Defendant Rose has a residential address for service of process believed to be 4548 S. Woodlawn Avenue, Chicago, IL 60653.

16.     At all times relevant hereto, Defendant MOHAMMAD NEWAZ ("Newaz") is a professor within the College of Pharmacy at CSU, and is thereby an employee, agent, and/or workman, or CSU. Upon information and belief, Defendant Newaz has a residential address for service of process believed to be 16504 Paw Paw Avenue, Orland Park, IL 60467.

## APPLICABLE LAW AND POLICY

Applicable Federal Law

17.     The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

18.     Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

19.     Specifically, Title II of the ADA prohibits all state and local governmental entities, including public colleges and universities, from discriminating against people with disabilities.

20.     Similarly, under the Rehabilitation Act of 1973, specifically, Section 504, "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a).

Applicable Illinois State Law

21.     Art. I, § 2 of the Constitution of the State of Illinois provides that, "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

Applicable CSU Policy

22.     Defendant CSU has a Diversity and Equal Opportunity Policy Statement publicly accessible on its website[1], which provides in relevant part, as follows:

---

[1] https://www.csu.edu/eeo/diversityeeopolicy.htm

- 5 -

Chicago State University supports the principles of equal opportunity and diversity in employment and education. The University seeks to insure that no person will encounter discrimination in employment or education on the basis of age, color, disability, sex, national origin, race, religion, sexual orientation, or veteran's status. This policy is applicable to both the employment practices and administration of programs and activities within the University. It is the policy of the University that no person shall be excluded from the participation in, be denied the benefits of, or in any way be subject to discrimination in any program or activity at the University.

## GENERAL FACTUAL ALLEGATIONS

23. Plaintiff enrolled in the College of Pharmacy of Defendant CSU in August of 2017.

24. By March 2020, he had completed over three years of CSU's four-year program for a degree as a Doctor of Pharmacy.

25. By that time, Plaintiff had incurred over $150,000 in student loan debt.

26. As a graduate Doctor of Pharmacy, Plaintiff would have been likely to earn $130,000 a year, which is approximately the average salary for such a position[2].

27. Plaintiff would have been likely to begin to earn such annual income, had he been allowed to continue his rotational internships as a student and obtain his doctorate as he anticipated in May 2021.

28. Unfortunately, due to a pattern and practice of unprofessional, negligent, and otherwise tortious conduct on the part of CSU and its staff, Plaintiff's dream of becoming a Doctor of Pharmacy did not come to fruition.

29. Importantly, Plaintiff suffers from the medical condition or disability of Attention-Deficit/Hyperactivity Disorder ("ADHD"); a diagnosis he received in his youth, around 2015-2016.

---

[2] https://www.glassdoor.com/Salaries/doctor-of-pharmacy-salary-SRCH_KO0,18.htm

30.     The National Institute of Mental Health, one of the National Institutes of Health and part

of the U.S. Department of Health and Human Services, explains[3] that:

> Attention-deficit/hyperactivity disorder (ADHD) is marked by an ongoing pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. People with ADHD experience an ongoing pattern of the following types of symptoms:
>
> - **Inattention** means a person may have difficulty staying on task, sustaining focus, and staying organized, and these problems are not due to defiance or lack of comprehension.
>
> - **Hyperactivity** means a person may seem to move about constantly, including in situations when it is not appropriate, or excessively fidgets, taps, or talks. In adults, hyperactivity may mean extreme restlessness or talking too much.
>
> - **Impulsivity** means a person may act without thinking or have difficulty with self-control. Impulsivity could also include a desire for immediate rewards or the inability to delay gratification. An impulsive person may interrupt others or make important decisions without considering long-term consequences.

31.     Plaintiff's ADHD causes him to struggle with concentration, a symptom which he manages

with medication, Adderall 30mg once daily.

32.     In connection with his disability, Plaintiff registered with CSU's Abilities Office of Student

Services, and was provided an Accommodation Letter in or about the Spring of 2020, which

entitled him to double the time on tests and quizzes. Find a true and correct copy of this

Accommodation Letter annexed hereto as **EXHIBIT "A"**.

33.     Despite Plaintiff's disability, however, he was nonetheless otherwise qualified for the

education program in which he was participating at CSU, as evidenced by the fact that he had

successfully completed his P1 and P2 years, and was then into his P3 year's course of study.

---

[3] https://www.nimh.nih.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd

34.     Thus, though Plaintiff's ADHD is a disability within the meaning of the Americans with Disability Act and the Rehabilitation Act, his condition did not interfere with his ability to successfully complete the College of Pharmacy program or to be employed after graduation as a pharmacist; rather, his inability to complete the College of Pharmacy program was due to the hostile educational environment CSU provided, and specifically, how that hostility exacerbated Plaintiff's ADHD.

35.     Specifically, during the second semester of Plaintiff's P3 year, Plaintiff was enrolled in the DMTM2 (Disease and Medication Therapy Management) course with Defendant Professor Jenkins.

36.     Plaintiff provided Professor Jenkins with a copy of Plaintiff's Accommodations Letter, to which Professor Jenkins replied "Received and Acknowledged". Find true and correct screen captures the email thread between Plaintiff and Defendant Jenkins annexed hereto as **EXHIBIT "B"**.

37.     Grading for Prof. Jenkins' DMTM2 class consisted of five (5) patient applications in which the student had to determine the Subject, Objective, Assessment, and Plan (hence the name, "SOAP Notes") for a hypothetical patient, two (2) examinations, and one (1) class presentation.

38.     Defendant Jenkins set Plaintiff, as well as the entire DMTM2 class, up for failure when he canceled numerous classes during the semester.

39.     These classes were never made up by Prof. Jenkins, and as a result, Plaintiff and his fellow classmates were placed in a disadvantageous position with respect to passing the class, having missed out on the critical instruction time they bargained and paid for through their tuition dollars.

40.     Additionally, Professor Jenkins repeatedly demonstrated himself to be a very aggressive, very callous professor who displayed open hostility towards his students.

41.     Prior to the start of the Plaintiff's first examination in Jenkins' DMTM2 course, in response to questions that Jenkins was receiving from students regarding the exam, Jenkins yelled out across the classroom, "Ya'll don't know shit".

42.     Another student proceeded to ask Professor Jenkins if the examination should be completed in ink pen, to which Jenkins quite cockily responded, "you guys can use crayons if you want."

43.     Plaintiff viewed these statements from Jenkins as highly inappropriate for a professor to say to his students, and the overtly hostile environment Jenkin's comments created just prior to the start of an already stressful examination severely triggered Plaintiff's ADHD symptomology.

44.     Hostile environments, such as the one Jenkins created by yelling at Plaintiff's class, exacerbate Plaintiff's ADHD symptoms, causing increased anxiety and an inability to focus/concentrate.

45.     It should be noted that CSU has a Code of Excellence, which is publicly available online[4], and which is applicable to students and CSU staff alike, as members of the CSU community.

46.     The CSU Code of Excellence states, in relevant part:

> I will respect the dignity of all persons.
>
> Behaviors which compromise or demean the dignity of individuals or groups, including hazing, intimidating, taunting, teasing, baiting, ridiculing, insulting, harassing and discriminating are not acceptable.
>
> I will strive for true cultural diversity and learn to accept and value the differences of others.
>
> Denial of equal rights and opportunities for all regardless of their age, sex, race, religion, disability, ethnic heritage, socioeconomic status, sexual orientation, and gender [identity], political, social or other affiliation or disaffiliation is not acceptable.
>
> I will respect the basic human rights of all.

---

[4] https://www.thefire.org/sites/default/files/2015/08/13114212/Chicago-State-University-Code-of-Excell...dergraduate-_-Chicago-State-University-copy.pdf

> Behaviors that are inconsiderate, insensitive, inhospitable, or inciteful, or which unjustly or arbitrarily inhibit another's abilities to feel safe or welcomed in the pursuit of appropriate academic goals are not acceptable.

47.    Clearly then, given Professor Jenkins' status as a member of the CSU community to whom the foregoing policy applies, Jenkin's inconsiderate, insensitive, and inhospitable comments violated CSU's Code of Excellence, causing harm to Plaintiff.

48.    Plaintiff proceeded to take the examination for the course on the required Examsoft software.

49.    Plaintiff was to be given double the test time as stated in his Accommodation Letter; however, Plaintiff was only ever provided time and a half (x1.5) additional time.

50.    Plaintiff completed the examination on the required ExamSoft software, turning in his signed notes prior to leaving the examination room.

51.    CSU procedures require students to sign and date all scratch paper, if used while taking an examination, and to turn said notes in at the end of the examination.

52.    Professor Jenkins gave Plaintiff a failing grade on the examination due to not writing out calculations within the ExamSoft software.

53.    Previously, points had not been deducted for failing to show diabetes calculations on scrap paper or on the examination as the calculations are of an elementary level.

54.    Plaintiff's ADHD requires him to write out mathematical equations to maintain focus, thus Plaintiff necessarily writes out all mathematical calculations above elementary level calculations.

55.    Pointing this out to Jenkins, Jenkins awarded Plaintiff credit for the diabetes examination questions, however, he subsequently removed the diabetes questions from the examination altogether, significantly altering the grading of the exam and skewing the results, which were released about three weeks later.

56.     As a result of Jenkins arbitrarily removing the diabetes questions, Plaintiff failed the exam.

57.     Plaintiff subsequently sought an examination review, however, the professors on the review panel failed to appear and so Plaintiff subsequently left.

58.     Had the panel of professors appeared for an examination review with Plaintiff, it is probable that the points deducted would have been returned to Plaintiff, which would have allowed Plaintiff a passing exam score.

59.     Subsequent to this, Plaintiff started his first pharmacy rotation with the University of Chicago Hospital.

60.     Two days before Plaintiff was set to successfully complete his rotation at the University of Chicago Hospital, as a result of the failed DMTM2 exam, Plaintiff was notified that he was being placed on academic probation, which immediately ended his rotation. Find a true and correct copy of the Notice of Academic Probation which Plaintiff received on or about May 18, 2020, annexed hereto as **EXHIBIT "C"**.

61.     Plaintiff promptly appealed this decision by filing a grievance with CSU.

62.     Defendant Allison Rose, Interim Associate Dean of Pharmacy Affairs, failed, however, to properly process the appeal pursuant to CSU policy and procedure.

63.     Specifically, via correspondence dated May 22, 2020, from Defendant Rose to Plaintiff, Rose indicates that Plaintiff's "grievance has been dismissed" based on the foregoing:

　　　　a.  "[Plaintiff] failed to arrange a meeting with the appropriate Department Chair within ten (10) calendar days after meeting with the faculty member..." and

　　　　b.  "You were not treated arbitrarily or unfairly within the context of the course."

A true and correct copy of Defendant Rose's correspondence is annexed hereto as **EXHIBIT "D"**.

64.     Given that Defendant Jenkins' conduct toward *all* of Plaintiff's classmates in the DMTM2 course was equally arbitrary and unfair, perhaps Defendant Rose's second contention that "within the context" of the already arbitrary and unfair course, Jenkins' treatment of Plaintiff *specifically* was not arbitrary or unfair.

65.     Even so, Rose's contention that Plaintiff failed to arrange a meeting with the appropriate Department Chair within ten (10) calendar days after meeting with the faculty member, is factually inaccurate.

66.     Plaintiff did, in fact, meet with Dr. Janene Marshall, within this time constraint, and further, Plaintiff informed Defendant Rose of said meeting, via email, dated May 27, 2020. A true and correct screen capture of this email correspondence to Defendant Rose is annexed hereto as **EXHIBIT "E"**.

67.     Despite Plaintiff informing Defendant Rose of same, Rose did nothing to overturn the dismissal of Plaintiff's grievance.

68.     Of particular note, leading up to the Academic Standing Committee meeting of May 18, 2020, Plaintiff was advised via email dated May 17, 2020, by Defendant Mohammad Newaz, then Interim Associate Dean of Academic Affairs, that Plaintiff's attendance at the meeting was "optional".

69.     This statement by Newaz completely contradicted his prior statement in his email from the day before, wherein he stated that, "Since you failed to achieve the needed criteria for satisfactory academic progression, you are required to meet with the COP Academic Standing Committee to discuss your academic standing." (emphasis added).

70.     Further, Newaz informed Plaintiff in his email of May 17, 2020, that Plaintiff was not permitted to have an attorney or student advisor present during the Academic Standing Committee meeting, instructing Plaintiff to, "Please refrain from including anyone other than you."

71.     Plaintiff responded to Defendant Newaz indicating that nowhere in the Student Handbook did it indicate that Plaintiff could not bring an attorney to such a meeting, and further, Plaintiff pointed out the Newaz had previously indicated that Plaintiff's attendance at the Academic Standing Committee was required, and not optional.

72.     In response, Defendant Newaz stated "The student handbook is for students and not for an attorney. Just to be sure, these communications are privileged and meant only for you." True and correct screen captures of these emails between Defendant Newaz and Plaintiff are annexed hereto as **EXHIBIT "F"**.

73.     Defendant Newaz's response seems to suggest that it is his belief that students are not entitled to seek the opinion of legal counsel as it relates to CSU's administration of its educational program vis-à-vis its adherence to the procedures and policies outlined in the Student Handbook.

74.     In other words, should CSU fail to adhere to its own procedures and policies, given that the "student handbook is for students and not for an attorney," (in Defendant Newaz's view), students are evidently supposed to blindly accept whatever form of arbitrary or capricious adjudicative process they are provided with.

75.     As a result, Plaintiff was required to maneuver his academic probation appeal without the participation of Plaintiff's attorney or student advisor, a direct breach of CSU's policies and procedures regarding appeals of this nature.

76.     To that end, annexed hereto as **EXHIBIT "G"** is the very policy from CSU's Student Handbook, which, as Plaintiff correctly indicated to Defendant Newaz, makes no mention of the

alleged fact that students are not permitted to have counsel or student advisors present at such committee meetings.

77.     In light of Plaintiff's inappropriately handled grievance process, which ultimately did not result in the modification of his failing grade or the overturning of his academic probation, in order to nonetheless further his education and continue to advance through the educational program, Plaintiff followed through in repeating his P3 year, consisting of two semesters comprising one course each.

78.     As before, in connection with his disability, Plaintiff again registered with CSU's Abilities Office of Student Services, and was provided an Accommodation Letter on or about February 8, 2021, which entitled him to double the time on timed-assignments, quizzes and tests. Find a true and correct copy of this Accommodation Letter annexed hereto as **EXHIBIT "H"**.

79.     During the second semester of Plaintiff's repeated P3 year, Plaintiff again found himself enrolled in DMTM2.

80.     This time, the course was taught not only by Professor Jenkins, but by an additional professor, Defendant Vicky Shah.

81.     As before, Plaintiff provided his Accommodation to Prof. Jenkins as well as to Prof. Shah, and in response, Jenkins indicated that same was "received and Acknowledged." Find a true and correct screen capture of this email exchange annexed hereto as **EXHIBIT "I"**

82.     In anticipation of repeating DMTM2, Plaintiff studied the entirety of his prior DMTM2 notes before the start of the semester to reacquaint and prepare himself.

83.     Plaintiff successfully completed all assignments, but continued to struggle with examinations, as did everyone in the course.

84.     Even so, Plaintiff scored somewhat higher than the class average on both class examinations, which, woefully, were regularly between a 40-50%, but nonetheless still failed.

85.     It must be said that if the entire class average for examination scores is typically only between 40% to 50%, this clearly is not the failure of all the students collectively to comprehend the material; rather, there is a systemic pedagogical failure in the manner in which the class is taught.

86.     Even so, CSU appeared perfectly content with the atrocious scores, and perfectly content with visiting academic punishment for said scores on its students, rather than placing the blame upon its professors and itself.

87.     As a result of the failing exam score, Plaintiff planned to meet with Professor Jenkins to discuss his grade at Jenkins' examination review period.

88.     Professor Jenkins, however, failed to attend his own examination review period, leaving Plaintiff with no recourse and no remediation procedure as outlined in CSU's policies and procedures.

89.     Plaintiff's final grade in DMTM2 was a 69.5%.

90.     The minimum passing grade for the course was a 70.0% which translates roughly to about 2.5% on any given exam.

91.     Thus, the half-a-percent (0.5%) which Plaintiff failed the course by represented only a few points on any given exam – points which Plaintiff almost certainly would have made up had Jenkins attended him examination review period.

92.     As a result, Plaintiff sent Defendant Shah and Defendant Jenkins a re-grade request.

93.     As required, the request included proof corroborating that Plaintiff's answers were correct, including journal articles, clinical trial studies, and information from the American Heart Association.

94.     Defendant Shah and Defendant Jenkins denied Plaintiff's re-grade request. No reason given.

95.     As a result of Plaintiff receiving the 69.5% in the class, Plaintiff received an email informing him of an Academic Standing Committee meeting as he was facing potential dismissal for his repeated failure of the DMTM2 course.

96.     This Academic Standing Meeting took place on or about May 14, 2021 via Zoom, and was attended by Defendant Newaz and Defendant Lalita Prasad-Reddy, an Assistant Dean and professor within the College of Pharmacy.

97.     The day before the meeting, Defendant Prasad-Reddy informed Plaintiff that dismissals were determined on a case-by-case basis and that Plaintiff should not worry.

98.     Despite this assurance from Prasad-Reddy, the Academic Standing Committee nonetheless proceeded to dismiss Plaintiff, informing him via email about only an hour or two after the meeting.

99.     As a result, Plaintiff received his formal dismissal letter on May 14, 2021, a true and correct copy of which is annexed hereto as **EXHIBIT "J"**.

100.    Defendant Zaldwaynaka Scott, as President of CSU, and Defendant Matthew Fete, as Dean of the College of Pharmacy, had actual, constructive, or inquiry knowledge of the school's policies and procedures, and further, had actual, constructive, or inquiry knowledge of the inappropriate, arbitrary, and capricious manner in which students in their care at CSU, such as Plaintiff, were being treated.

101.    CSU's lack of concern for the inappropriate, unprofessional, and policy-violating conduct of Prof. Jenkins occasioned an educational environment that was overtly hostile and not conducive to learning for students in DMTM2 generally, and which was hazardous to Plaintiff specifically, given his disability, which at all times CSU staff, including Jenkins, was fully aware of.

102.    CSU's lack of consistency and adherence to the school's own policies then deprived Plaintiff of a fair resolution to his initial academic grievance and forced him to unjustly repeat his P3 year.

103.    Unrelated to Plaintiff's dismissal, but illustrative again of CSU's failure to abide by their own policies, during his time at the school, Plaintiff paid approximately $300.00 towards printing services as part of his tuition charges.

104.    Despite tendering this money, no such printing services were provided to the students, including Plaintiff.

105.    Additionally, as to CSU's lack of consistency with respect to its own policies, in the past, CSU has allowed other students without disabilities to take a course for a third time, including but not limited to, at least two (2) other students which Plaintiff is aware of.

106.    Importantly, one such student, failed DMTM2 twice, was dismissed, reapplied to the university, and after speaking with Defendant Prasad-Reddy, was permitted to take the course a third time.

107.    Defendant Prasad-Reddy did not afford Plaintiff the same opportunity.

108.    It must also be noted that the DMTM2 course was subsequently removed from the College of Pharmacy's educational program, and thus, it seems apparent that Plaintiff and the rest of his class were nothing more than guinea pigs to CSU – a test case as the school tried and failed to right a course poorly taught by a Professor who seemed wholly ill-equipped to teach it.

109.     As a result of the Defendants' individual failures, as well as their collective pattern and practice of arbitrary, capricious, negligent, and otherwise tortious treatment of Plaintiff, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

## CAUSES OF ACTION

### COUNT I

**DISCRIMINATION UNDER THE
AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA"), as amended,
AND SECTION 504 OF THE REHABILITATION ACT OF 1973 ("Section 504")
(As Defendant Chicago State University)**

110.     Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

111.     Plaintiff is a protected disabled individual under the Americans with Disabilities Act, 42 U.S.C. § 12131-12150, where a disabled person is defined as an individual who has a physical or mental impairment that substantially limits one or more of the major life activities of an individual or who has a record of such an impairment, or an individual who is being regarded as having such an impairment.

112.     Defendant CSU, by and through its employees, workmen, agents and authorities, including Defendants Scott, Fete, Jenkins, Shah, Prasad-Reddy, Rose, and Newaz, intentionally discriminated against or denied Plaintiff the benefit of the educational program in connection with his continued enrollment as a student thereat, in violation of the ADA.

113.     Title II of the ADA, 42 U.S.C. § 12132, provides that:

> [N]o qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the

> benefits of the services, programs, or activities of a public entity, or
> be subjected to discrimination by any such entity.

114.    Similarly, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides, in pertinent

part:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705(20) of this title, shall, solely by
> reason of her or his disability, be excluded from the participation in,
> be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance

115.    Defendant CSU is a public university which receives federal funds.

116.    Because Plaintiff's diagnosed ADHD and its resulting sequalae and symptomology

substantially limit at least one of his major life activities – namely his ability to maintain focus

and/or concentrate – Plaintiff is an individual with a disability under the ADA and Section 504 of

the Rehabilitation Act.

117.    The term "qualified individual with a disability" within the meaning of the Rehabilitation

Act, means an individual "who, with or without reasonable modifications to rules, policies, or

practices ... meets the essential eligibility requirements for receipt of services or the participation

in programs or activities provided by a public entity." 42 U.S.C. § 12131(2)

118.    This very Court has previously held that, "To state a claim under Title II [of the ADA], a

plaintiff must allege that (1) he is disabled under the ADA, (2) he is qualified for the benefits he

sought, (3) he was denied those benefits or otherwise discriminated against on account of his

disability, and (4) the defendant is a public entity." Naperville Smart Meter Awareness v. City of

Naperville, 69 F.Supp.3d 830, 843 (7th Cir. 2014).

119.    Addressing each of these elements in turn, (1) Plaintiff, as previously stated, is disabled

under the ADA, for he is individual who has a physical or mental impairment (ADHD) that

substantially limits one or more of the major life activities, as aforesaid.

120.     Despite Plaintiff's disability, however, (2) Plaintiff was otherwise qualified for the benefits – i.e., the educational program – he sought from Defendant CSU.

121.     To be "otherwise qualified" for a postsecondary education program, such as the one Plaintiff was participating in, an individual with a disability must satisfy the program's requirements, "with or without an accommodation." Watson v. Lithonia Lighting, 304 F.3d 749, 752 (7th Cir. 2002).

122.     Plaintiff is clearly an otherwise qualified individual as evidenced by the fact that he had successfully completed his P1 and P2 years, was then into his P3 year's course of study.

123.     Further, but-for Defendant Jenkins' demeaning and harassing conduct in violation of CSU's own Code of Excellence, and the adverse impact that it had on Plaintiff given his disability, which Defendant Jenkins had reason to know about given his receipt of Plaintiff's Accommodation Letter, it seemed wholly likely that Plaintiff would have performed better on Jenkins' DMTM2 exams and would have continued on, unimpeded, for the remaining time he had left to complete of the program.

124.     As such, despite Plaintiff's otherwise qualified status, and as a result of Defendant Jenkins' conduct as aforesaid, as well as the failure of CSU and any of the other Defendants to do anything to remedy the situation, (3) Plaintiff was thereby denied the benefit of the educational program and was excluded therefrom, on the basis of his disabilities and how those disabilities, as exacerbated by the hostile educational environment created by Jenkins and perpetuated by all Defendants, affected his academic performance, in violation of the ADA and Section 504.

125.     Finally (4), CSU is a public entity in that it is a public university and recipient of federal funds, as alleged.

126.    Therefore, with respect to Plaintiff – an individual with a disability as defined under the ADA and Section 504 – Defendant CSU, by and through its employees, workmen, agents and authorities, including Defendants Scott, Fete, Jenkins, Shah, Prasad-Reddy, Rose, and Newaz have excluded Plaintiff from, denied him the benefits of, or otherwise subjected him to discrimination under the educational program – a program which he was otherwise qualified for – and they have done so by reason of Plaintiff's disability, in gross violation of both the ADA and Section 504 of the Rehabilitation Act.

127.    As a direct and proximate result of Defendant CSU's violation of Plaintiff's clearly established rights under the ADA and Section 504, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

## <u>COUNT II</u>
### VIOLATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
**(As to Defendants Zaldwaynaka Scott, Matthew Fete, Antoine Jenkins, Vicky Shah, Lalita Prasad-Reddy, Allison Rose, and Mohammad Newaz)**

128.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

129.    42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution **and laws**, shall be liable to the party injured in an action at law...

> (Emphasis added)

130.    42 U.S.C. § 1983 provides a private right of action for damages to individuals who are deprived of any rights, privileges or immunities protected by the Constitution or federal law, by any person acting under color of law.

131.    When a public officer violates the constitutional rights of a citizen, 42 U.S.C. § 1983 provides the vehicle for a legal claim. <u>Savory v. Lyons</u>, 469 F.3d 667, 670 (7th Cir. 2006).

132.    Importantly, 42 U.S.C. § 1983 imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980).

133.    42 U.S.C. § 1983 authorizes claimants to sue persons in their individual capacities who are alleged to have violated such rights. <u>Lewis v. Downey</u>, 581 F.3d 467, 472-73 (7th Cir. 2009).

134.    Similarly, 42 U.S.C. § 1983 also authorizes claimants to sue persons in their official capacities. <u>Estate of Sims ex rel. Sims v Cnty. of Bureau</u>, 506 F.3d 509, 514-15 (7th Cir. 2007).

135.    Defendant Zaldwaynaka Scott ("Scott") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as the President of CSU.

136.    Defendant Scott, in her official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

137.    Defendant Scott is not entitled to a defense of qualified immunity for her said violations of these federal laws, as she violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which she specifically, given her position as President of CSU, would have known.

138.    Specifically, a reasonable person, particularly one in Defendant Scott's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to dismiss him from his educational program on the basis of his disability, as was the case herein.

139.    Defendant Scott thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

140.    Pursuant to 42 U.S.C. §1983, Defendant Scott is therefore individually liable to Plaintiff for his damages.

141.    Defendant Matthew Fete ("Fete") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as the Dean of the College of Pharmacy at CSU.

142.    Defendant Fete, in his official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

143.    Defendant Fete is not entitled to a defense of qualified immunity for his said violations of these federal laws, as he violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which he specifically, given his position as Dean of the College of Pharmacy at CSU, would have known.

144.    Specifically, a reasonable person, particularly one in Defendant Fete's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to dismiss him from his educational program on the basis of his disability, as was the case herein.

- 23 -

145.    Defendant Fete thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

146.    Pursuant to 42 U.S.C. §1983, Defendant Fete is therefore individually liable to Plaintiff for his damages.

147.    Defendant Antoine Jenkins ("Jenkins") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as a professor within the College of Pharmacy at CSU.

148.    Defendant Jenkins, in his official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

149.    Defendant Jenkins is not entitled to a defense of qualified immunity for his said violations of these federal laws, as he violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which he specifically, had reason to know of given his receipt of Plaintiff's Accommodation Letters.

150.    Specifically, a reasonable person, particularly one in Defendant Jenkin's position as a professor at a public university, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to deny Plaintiff the benefit of the educational program, i.e., his DMTM2 course, on the basis of his disability, or to discriminate against or harass Plaintiff such that his known disability causes such a deprivation.

151.    Defendant Jenkins thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

152.    Pursuant to 42 U.S.C. §1983, Defendant Jenkins is therefore individually liable to Plaintiff for his damages.

153.    Defendant Vicky Shah ("Shah") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as a professor within the College of Pharmacy at CSU.

154.    Defendant Shah, in his official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

155.    Defendant Shah is not entitled to a defense of qualified immunity for his said violations of these federal laws, as he violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which he specifically, had reason to know of given his receipt of Plaintiff's Accommodation Letters.

156.    Specifically, a reasonable person, particularly one in Defendant Shah's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to deny Plaintiff the benefit of the educational program, i.e., his DMTM2 course, on the basis of his disability, or to discriminate against Plaintiff such that his known disability causes such a deprivation.

157.    Defendant Shah thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

158.    Pursuant to 42 U.S.C. §1983, Defendant Shah is therefore individually liable to Plaintiff for his damages.

159.    Defendant Lalita Prasad-Reddy ("Prasad-Reddy") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as an Assistant Dean and professor within the College of Pharmacy at CSU.

160.    Defendant Prasad-Reddy, in her official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

161.    Defendant Prasad-Reddy is not entitled to a defense of qualified immunity for her said violations of these federal laws, as she violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which she specifically, given her position as Assistant Dean, would have known.

162.    Specifically, a reasonable person, particularly one in Defendant Prasad-Reddy's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to dismiss him from his educational program on the basis of his disability and the manifestations thereof, as was the case herein.

163.    Defendant Prasad-Reddy thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

164.    Pursuant to 42 U.S.C. §1983, Defendant Prasad-Reddy is therefore individually liable to Plaintiff for his damages.

165.    Defendant Allison Rose ("Rose") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as Interim Associate Dean of Pharmacy Affairs.

166.    Defendant Rose, in her official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

167.    Defendant Rose is not entitled to a defense of qualified immunity for her said violations of these federal laws, as she violated Plaintiff's clearly established statutory rights under the ADA

and Section 504, which not only a reasonable person would have known, but which she specifically, given her position as Interim Associate Dean of Pharmacy Affairs, would have known.

168.    Specifically, a reasonable person, particularly one in Defendant Rose's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to dismiss him from his educational program on the basis of his disability and the manifestations thereof, as was the case herein.

169.    Defendant Rose thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

170.    Pursuant to 42 U.S.C. §1983, Defendant Rose is therefore individually liable to Plaintiff for his damages.

171.    Finally, Defendant Mohammad Newaz ("Newaz") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as Interim Associate Dean of Academic Affairs.

172.    Defendant Newaz, in his official and individual capacities, has deprived Plaintiff of his rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in the General Factual Allegations and Count I herein.

173.    Defendant Newaz is not entitled to a defense of qualified immunity for his said violations of these federal laws, as he violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which he specifically, given his position as Interim Associate Dean of Academic Affairs, would have known.

174.    Specifically, a reasonable person, particularly one in Defendant Newaz's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA

and Section 504, to dismiss him from his educational program on the basis of his disability and the manifestations thereof, as was the case herein.

175.    Defendant Newaz thus acted intentionally and with deliberate and/or callous disregard for Plaintiff's clearly established rights.

176.    Pursuant to 42 U.S.C. §1983, Defendant Newaz is therefore individually liable to Plaintiff for his damages.

177.    The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

178.    Each of the aforesaid Defendants, by and through their actions as alleged, have deprived Plaintiff of his clearly established right to due process, both under the ADA and the Fourteenth Amendment to the United States Constitution, causing harm to Plaintiff.

179.    Further, pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to his attorney's fees incurred in connection with bringing this action in vindication of Plaintiff's rights.

## COUNT III
### BREACH OF CONTRACT
### (As to Defendant Chicago State University)

180.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

181.    Plaintiff contracted with Defendant CSU for the provision of a certain educational program and educational services in connection therewith.

182.    Plaintiff fulfilled his obligation pursuant to said contract by tendering payment to the Defendant, whether personally or through a third-party payor, for the provision of said educational program and services.

183.    Plaintiff further fulfilled his obligation pursuant to said contract by performing thereunder, in that he attended to the academic requirements of the educational program, attended classes, and performed the required coursework.

184.    Defendant CSU, however, through its employees, workmen, agents and authorities, has breached its contract with the Plaintiff in that it has not fully performed, has breached its own expressed policies, and has thereby misrepresented material contract terms to Plaintiff.

185.    Specifically, Defendant has not fully performed in that it failed to completely tender the educational program for which Plaintiff contracted.

186.    An example of this failure to completely tender the educational program which Plaintiff contracted for is the repeated absence of Prof. Jenkins to attend, and therefore provide, his DMTM2 course.

187.    Another example of this failure is the failure of the professors on the exam review panel to appear such that Plaintiff could attempt to remediate his failing test score.

188.    Another example of this failure is the failure of CSU administration to provide the printing services for which Plaintiff contracted and paid.

189.    Additionally, Defendant CSU has violated its own internal policies as they relate to the educational program it provides.

190.    Specifically, and as cited earlier, Defendant CSU has a Diversity and Equal Opportunity Policy Statement publicly accessible on its website[5], which provides in relevant part, as follows:

> Chicago State University supports the principles of equal opportunity and diversity in employment and education. The University seeks to insure that no person will encounter discrimination in employment or education on the basis of age, color, disability, sex, national origin, race, religion, sexual orientation, or veteran's status. This policy is applicable to both the employment practices and administration of programs and activities

---

[5] https://www.csu.edu/eeo/diversityeeopolicy.htm

> within the University. It is the policy of the University that no person shall be excluded from the participation in, be denied the benefits of, or in any way be subject to discrimination in any program or activity at the University.

191.     Despite this policy, and CSU's promise therein not to exclude a student from participation in program or activity at the University, or to deny a students the benefits of any program or activity at the University, or in any way subject a student to discrimination in any program or activity at the University, Defendant CSU has done just that as it relates to Plaintiff.

192.     Additionally, and as previously stated, CSU has a Code of Excellence which applies equally to students and staff as members of the CSU community.

193.     Given Professor Jenkins' status as a member of the CSU community to whom this Code of Excellence applies, Jenkin's inconsiderate, insensitive, and inhospitable comments as complained of earlier herein, violated CSU's Code of Excellence, causing harm to Plaintiff.

194.     Additionally, CSU has a written policy relating to the academic misconduct and/or professional appeal procedures.

195.     Despite Plaintiff following said procedure, Defendant CSU baselessly dismissed Plaintiff's grievance in contravention of these procedures.

196.     Additionally CSU has a written Student Handbook, the relevant provisions of which, make no mention of the alleged fact that students are not permitted to have counsel or student advisors present at Academic Standing Committee meetings.

197.     Despite this, Defendant Newaz explicitly instructed Plaintiff that he could not have an attorney nor student advisor present, remarking that the "student handbook is for students and not for an attorney."

198.     As a result, Plaintiff was required to navigate his academic probation appeal without the participation of Plaintiff's attorney or student advisor, a direct breach of CSU's policies and procedures regarding appeals of this nature.

199.     All of these various policies and procedures promulgated by Defendant CSU itself, whether in the Student Handbook or on CSU's website, constitute the written terms of the bargain – in other words, these provisions collectively are the contract terms as between Plaintiff and CSU, outlining each party's obligations to the other.

200.     In enrolling at CSU and paying tuition, Plaintiff accepted these terms and understood the bargain as between he and CSU to be that which was reflected in those policies.

201.     Unfortunately, as Plaintiff came to find, for instance, in the numerous examples cited above, the on-paper terms of the bargain as provided by CSU did not reflect the true terms of the bargain in practice, as CSU regularly failed to abide by their own policies and procedures.

202.     Thus, not only did Defendant CSU materially misrepresent its contract terms vis-à-vis the various policies it deviated from, Defendant CSU arbitrarily and capriciously breached its contract with Plaintiff and failed to deal in good faith, failing to provide Plaintiff the benefit of his bargain, all the while still accepting Plaintiff's tuition dollars even so.

203.     As a direct and proximate result of Defendant CSU's breach, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

**COUNT IV**
**NEGLIGENCE**
**(As to all Defendants)**

204.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

205.    Defendant CSU, as a public university and recipient of federal funds, owed Plaintiff, as one of its students, a duty of care in the conduct and administration of its educational program.

206.    Specifically, and among other duties, CSU owed Plaintiff a duty to abide by the provisions of the ADA and Section 504.

207.    As articulated more fully in Count I, Defendant CSU has violated the ADA and Section 504.

208.    But-for Defendant's breach of the ADA and Section 504, Plaintiff would not have suffered the harm herein complained of.

209.    It is reasonably foreseeable that a student similarly situated to Plaintiff – in other words, an otherwise qualified student suffering from a disability – could suffer harm if a university, such as Defendant CSU failed to abide by the provisions of the ADA and Section 504 and actively discriminated against them or excluded them from or denied them the benefits of the educational program on the basis of their disability.

210.    Thus, as a direct and proximate result of Defendant CSU's violation of the ADA and Section 504, said Defendant has breached its duty to Plaintiff, and have caused Plaintiff to incur damages thereby.

211.    Additionally, Defendant CSU owes Plaintiff a duty of due care to abide by the provisions of its own internal policies.

212.     As stated previously herein, Defendant CSU has repeatedly violated numerous policies and procedures it itself has promulgated and published to the public.

213.     Defendant CSU voluntarily undertook this duty and disseminated the material outlining this duty to the student body, and therefore, it should be expected to be held to the standard that it set for itself.

214.     To that end, Defendant CSU has breached its duty to Plaintiff as set by these internal policy provisions.

215.     But-for the failure of Defendant CSU to abide by its own internal policies and procedures, Plaintiff would not have been placed into the hostile educational environment that exacerbated his known disability and occasioned his poor exam performance, and further, he would have had the full benefit of said educational program.

216.     It is reasonably likely that a similarly situated student as Plaintiff with a similar disability could face adverse educational consequences if the school fails to affirmatively foster an educational environment conducive to learning and commensurate with its publicly advertised policies.

217.     Thus, as a direct and proximate result of Defendant CSU's failure to abide by its own internal policies, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

218.     Similarly, Defendants Scott, Fete, Prasad-Reddy, Rose, and Newaz, as CSU President, Dean of the College of Pharmacy at CSU, Assistant Dean and professor within the College of Pharmacy at CSU, Interim Associate Dean of Pharmacy Affairs, and Interim Associate Dean of

Academic Affairs, respectively, each owed a duty of care in the conduct and administration of the educational program provided by the College of Pharmacy at CSU.

219. Specifically, and among other things, each of the aforesaid Defendants had a duty to ensure that the educational program provided by the College of Pharmacy at CSU was administered in accordance not only with State and Federal law, but also in observation of and in accordance with the school's own internal policies and procedures.

220. Further, to the extent that any one of these individuals oversaw, managed, or supervised each other such Defendant, the supervising Defendant also had a duty to ensure that the conduct of their subordinate Defendant was in accordance with State and Federal law, as well as internal CSU policy.

221. All individual Defendants named in this Count have breached their duty of care as owed to Plaintiff, as a student in their care.

222. Specifically, Defendants Scott, Fete, Prasad-Reddy, Rose, and Newaz, all failed in their supervisory roles to ensure CSU staff's compliance with the ADA as well as with CSU's internal policies such as the aforecited Diversity and Equal Opportunity Policy Statement and the CSU Code of Excellence, for example.

223. Additionally, these Defendants failed in their administrative roles to provide an equal access/equal opportunity educational program for students with disabilities, such as Plaintiff, and instead provided an academic environment that was overtly hostile and served only to exacerbate Plaintiff's known disability.

224. Finally, these Defendants failed in their adjudicative roles to administer a fair and consistent process with respect to academic standing, the appealing of grievances, and academic probation.

225.    But-for any one of these failures, Plaintiff would very likely have succeeded in his course of study or would not otherwise have been deprived of the benefit of the educational program.

226.    Further, it is reasonable foreseeable that a student, such as Plaintiff, may be set up for academic failure if the administrative staff of the student's university fails to adequately supervise its staff, fails to provide an educational program consistent with law or internal policy, fails to provide equal access/equal opportunity to students with disabilities, or fails to fairly and consistently administer academic disciplinary action in accord with the student's reasonable expectations vis-à-vis school policy.

227.    Thus, as a direct and proximate result of the individual and collective failures of Defendants Scott, Fete, Prasad-Reddy, Rose, and Newaz as aforesaid, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

228.    Finally, Defendants Jenkins and Shah, as professors within the College of Pharmacy at CSU, each owed a duty of care in the conduct and administration of the educational program provided by the College of Pharmacy at CSU, as it relates to the course they taught: DMTM2.

229.    Specifically, and among other things, Defendants Jenkins and Shah had a duty to (1) effectively teach the DMTM2 course material so as to maximize student learning; to (2) ensure that their conduct in so teaching the class was consistent with State and Federal law; to (3) ensure that their conduct in so teaching the class was consistent with internal CSU policy; to (4) fully provide the educational benefit bargained for by CSU College of Pharmacy students such as Plaintiff; and (5) to fulfill the duties inherent in their position with respect to such things as attending exam review panels and honoring re-grade requests when such requests have merit.

230.    Defendants Jenkins and Shah have breached these duties of care as owed to Plaintiff, as one of their students.

231.    Specifically, Defendants Jenkins and Shah – both when Jenkins taught DMTM2 individually and when he taught it jointly with Defendant Shah – breached their duty to effectively teach DMTM2 so as to maximize student learning.

232.    This is evidenced by the consistently atrocious average class examination grades of 40-50%, and is further evidenced by the fact that CSU eventually dropped the course entirely – unfortunately, not before Plaintiff was subjected to it.

233.    Additionally, Defendant Jenkins failed to ensure that his conduct in teaching DMTM2 was consistent with State and Federal law in that the overtly hostile educational environment his demeaning, abusive, and wholly inappropriate conduct created violated Plaintiff's clearly established rights, in violation of both the Illinois State Constitution and the ADA.

234.    Additionally, Defendant Jenkins failed to ensure that his conduct in teaching DMTM2 was consistent with internal school policy, specifically the aforecited Diversity and Equal Opportunity Policy Statement and the CSU Code of Excellence, both of which his conduct clearly violated.

235.    Additionally, Defendant Jenkins failed to fully provide the educational benefit bargained for by CSU College of Pharmacy students such as Plaintiff in that Jenkins regularly cancelled class unexpectedly and did not provide adequate instruction.

236.    Finally, Defendants Jenkins and Shah both failed to fulfill the duties inherent in their position with respect to such things as attending exam review panels and honoring re-grade requests when such requests have merit, in that they both failed to appear for examination review when Plaintiff sought to attend, and failed to honor – without explanation – Plaintiff's regrade request, despite the wealth of evidence Plaintiff provided that his answers were correct.

237.     But-for any one of these failures, Plaintiff would very likely have succeeded in his course of study or would not otherwise have been deprived of the benefit of the educational program.

238.     Further, it is reasonable foreseeable that a student, such as Plaintiff, may be set up for academic failure if his professors fail to effectively teach, fail to consistently grade, or fail to otherwise fulfill the duties of their post.

239.     Thus, as a direct and proximate result of the failures of Defendants Jenkins and Shah as aforesaid, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

## COUNT V
## NEGLIGENCE – *RESPONDEAT SUPERIOR*
### As to Defendant CSU

240.     Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

241.     At all times relevant herein, Defendants Scott, Fete, Prasad-Reddy, Jenkins, Shah, Rose, and Newaz, while engaging in the illegal, negligent, or otherwise tortious conduct complained of herein, were acting within the course and scope of their employment with the Defendant CSU.

242.     Defendant CSU is therefore vicariously liable for the illegal, negligent, and otherwise tortious conduct of these Defendants, as their employees, agents, and or workmen, pursuant to the principles of *respondeat superior*, agency, master-servant relationship, contribution, and/or indemnification.

## COUNT VI
## NEGLIGENCE *PER SE* IN VIOLATION OF ARTICLE I, SECTION 2 OF
## THE ILLINOIS STATE CONSTITUTION
### (As to All Defendants)

243.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

244.    As cited previously, Art. I, § 2 of the Constitution of the State of Illinois provides that, "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

245.    Thus, Art. I, § 2 of the Constitution of the State of Illinois establishes a duty of care in those acting under color of State law.

246.    As previously alleged, specifically in Counts I, II, and IV, Plaintiff was deprived by the Defendants, all acting under color of State law, of due process and the equal protection of the laws as arising under the ADA, and as guaranteed by the Fourteenth Amendment.

247.    By its plain language, the harm which Plaintiff endured as a result of the conduct of the Defendants is a harm which Art. I, § 2 of the Constitution of the State of Illinois was intended to prohibited.

248.    Further, as a student at CSU and a citizen of the State of Illinois, Plaintiff is precisely within the class of individuals whom Art. I, § 2 of the Constitution of the State of Illinois was intended to protect.

249.    Therefore, the illegal, negligent, and otherwise tortious conduct of all Defendants as complained of previously herein is negligent *per se* in direct violation of Art. I, § 2 of the Constitution of the State of Illinois.

## COUNT VII
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (As to All Defendants)

250.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

251.     To state a cause of action for negligent infliction of emotional distress, a plaintiff must allege facts establishing "either that she suffered a direct impact that caused emotional distress, or that she was a bystander in a zone of physical danger that caused her to fear for her own safety and that she suffered physical injury or illness as a result of her emotional distress." Hankins v. Alpha Kappa Alpha Sorority, Inc. 447 F.Supp.3d 672, 680, at f.n. 6, *citing* Borcia v. Hatyina, 391 Ill.Dec. 622, 31 N.E.3d 298, 310 (Ill. App. Ct. 2015).

252.     The threshold question for a negligent infliction of emotional distress claim is "whether the plaintiff properly alleged negligence on the part of the defendant." Id.

253.     As alleged more fully in Counts IV, V, and VI, all Defendants herein engaged in negligent conduct, the direct and proximate result of which was significant mental and emotional distress to Plaintiff.

254.     Thus, all Defendants, through their individual and collective failures as alleged, have negligently inflicted emotional distress upon the Plaintiff.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff BRANDEN GULLA, prays for relief as to all Counts as follows:

1)  For judgement against the Defendants jointly, severally, and alternatively, for general, compensatory, punitive, and exemplary damages, with interest;

2)  For an Order compelling Defendant CSU to permit Plaintiff be readmitted into the College of Pharmacy such that Plaintiff can complete the educational program;

3)  Reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. 1988, and

4)  For such other further relief as the Court may deem equitable and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure.

Respectfully submitted,

LENTO LAW GROUP, P.C.

DATED: <u>February 16, 2023</u>

Joseph Cannizzo Jr., Esquire
AL State Bar No. 3584O57X
LENTO LAW GROUP, P.C.
Chase Corporate Center
1 Chase Corporate Center, Suite 400
Birmingham, AL, 35244
T: (385) 485-0600 | F: (313) 992-1122
jcannizzo@lentolawgroup.com
*Attorney for Plaintiff*

# *EXHIBIT*
# *"A"*
# *(To Plaintiff's Second Amended Complaint)*

# CHICAGO STATE UNIVERSITY

### Abilities Office of Disabled Student Services
### Cordell Reed Student Union, Room #190
### Phone (773) 995-2385   Fax (773) 821-2506
### ACCOMMODATION LETTER

**ORIGINAL**

**TERM:**      **SPRING 2020**

**STUDENT NAME:** _Gulla, Branden_      **STATUS: UG** ___  **GR  X**

Dear Professor:

This letter is notification that the above-named student has registered with the Abilities Office of Student Services. The student has provided appropriate documentation of his/her disability to this office and is eligible to receive services in accordance with Section 504 of the Rehabilitation Act and the Americans with Disabilities Act. If note taking assistance, use of a tape recorder or testing accommodations applies to this student, refer to the attached paperwork for further instruction. Please contact Nicole Mathews, Assistant Director of    Abilities, nmathe21@csu.edu if there are any concerns regarding the authorized accommodation(s). Thank you for your support. **The following accommodations have been agreed upon:**

   **X**   Extended Time (Quizzes, Tests) (X2.0 (Double Time)

> *PLEASE RESPOND TO THE STUDENT'S EMAIL WITH "RECEIVED AND ACKNOWLEDGED COURSE#——" THIS LETTER WILL BE FILED IN THE ABILITIES OFFICE.*

          **CLASS**                    **INITIAL & DATE**
          **PHAR 6338**                         4/26/2020
          **PHAR 6323**

_____ **Student Signature**              4/24/20 **Date**
_____ **Assistant Director of Abilities**   4/24/20 **Date**

# *EXHIBIT*
# *"B"*
# *(To Plaintiff's Second Amended Complaint)*

 **Abilities Office** 4/29/20
To: Antoine   Cc: Branden, Hailey ›

## Re: Academic Accommodations —Gulla

Good day!

All documents have been received.

Thank you

> On Tue, Apr 28, 2020 at 1:57 PM Antoine Jenkins <ajenki29@csu.edu> wrote:
>
>
>
> Hello Branden,
>
> Received and Acknowledged.
>
> ---------- Forwarded message ---------

# *EXHIBIT*
# *"C"*
# *(To Plaintiff's Second Amended Complaint)*

*College of Pharmacy*

9501 S. King Drive/DH 206
Chicago, IL 60628
T 773.821.2500
F 773.821.2595

# NOTICE OF ACADEMIC PROBATION

May 18, 2020

Branden Gulla
P3 Professional Student

Dear Branden:

This letter serves as notice that you are being placed on academic probation by the College of Pharmacy Academic Standing Committee for earning two "D" grades in the professional program. To return to good academic standing, you will need to successfully repeat PHAR 6335 in the Fall 2020 and PHAR 6323 in the Spring 2021 semester. Failure to return to good academic standing will result in further action by the Committee and will result in your dismissal from the program. Please refer to your student handbook for additional information related to academic standing.

Please contact Dr. Alison Rose, Interim Associate Dean of Pharmacy Student Affairs, by July 1st, 2020 to address any registration issues. You will also need to contact Ms. Nicole Richardson, COP Learning Specialist, by August 15, 2020, to discuss your *required* Academic Success Plan for the 2020-2021 academic year. Failure to meet with Ms. Richardson will result in dismissal from the College of Pharmacy.

The decision of the Academic Standing Committee may be appealed to the Dean of the College of Pharmacy according to the appeal procedure that is described in your student handbook. Should you have any questions or concerns regarding an appeal, feel free to contact me.

Sincerely,

Dr. Mohammad Newaz
Chair, Academic Standing Committee
Chicago State University
College of Pharmacy

Cc: Dr. Matthew Fete, Dean. College of Pharmacy
Dr. Charisse Johnson. Assistant Dean, OECPE
Dr. Allison Rose. Interim Associate Dean, Student Affairs
Nicole Richardson, COP Learning Specialist



**CHICAGO STATE**
UNIVERSITY

csu.edu

# *EXHIBIT*
# *"D"*
## *(To Plaintiff's Second Amended Complaint)*

DocuSign Envelope ID: B23DF98F-2D1C-4D40-892A-772FCAA3B9B7

*College of Pharmacy*
*Office of Student Affairs*

9501 S. King Drive/DH 3083
Chicago, IL 60628
T 773.821.2500
F 773.821.2595

Allison Rose, PsyD
Interim Associate Dean of Student Affairs
Douglas Hall 3083

May 22, 2020

Dear Mr. Gulla,

I have carefully reviewed the available evidence surrounding the grievance submitted regarding your PHAR 6323, DMTM II, midterm exam. Your grievance has been dismissed based on the following:

*1)* You failed to arrange a meeting with the appropriate Department Chair within ten (10) calendar days after meeting with the faculty member. The Chair of Pharmaceutical Sciences and/or the Chair of Pharmacy Practice may elect to include the course instructor(s) or coordinator in the discussion. *If resolution is _not_ achieved at this level, see Step Three.*

2) You were not treated arbitrarily or unfairly within the context of the course.

Professionally,

Allison C. Rose, PsyD
Interim Associate Dean, Pharmacy Affairs

# *EXHIBIT*
# *"E"*
# *(To Plaintiff's Second Amended Complaint)*

 **Branden Gulla**                    5/27/20
To: Allison   Cc: Matthew ›

Hello Dr. Rose,

I did follow the necessary steps. We spoke to Dr. Marshal. ▮▮▮▮ helped me with the correct steps we needed to take and we did.

Branden Gulla

On May 27, 2020, at 7:21 PM, Allison Rose <arose21@csu.edu> wrote:

# *EXHIBIT*
# *"F"*
# *(To Plaintiff's Second Amended Complaint)*

## Academic Standing  Inbox ×

 **Dr. Mohammad Newaz** <mnewaz@csu.edu>  Sat, May 16, 2020, 1:33 PM

to me

Hello Branden,

Grades for all Spring courses are now submitted.  You have earned grade "D" in PHAR 6323, and you have previous "D" in PHAR 6335. Since you failed to achieve the needed criteria for satisfactory academic progression, you are required to meet with the COP Academic Standing Committee to discuss your academic standing.

Your appointment with the Academic Standing Committee is set for Monday, **May 18, 2020, at 02:20 pm**. This meeting will be through GoToMeeting, and detailed instruction to Join is attached.

Please reply to this email as soon as possible to confirm your appointment. In your email, please include your phone number where we can reach you. Please let me know if you have any questions.

Regards,

Dr. Newaz

 **Mohammad Newaz** <mnewaz@csu.edu>  Sun, May 17, 2020, 10:05 PM

to me

Hello Branden,

Thank you for your update.

Please note:

1. Attending this meeting is optional. You may choose not to participate. The committee will make its decision based on the existing guideline.

2. The academic standing committee does not speak with or in the presence of an attorney. Please refrain from including anyone other than you.

Thank you.

Dr. Newaz

*Mohammad Newaz MD, Ph.D., FAHA*
*Interim Associate Dean, Academic Affairs*
*Professor of Physiology and Pharmacology*
*College of Pharmacy*
*Chicago State University*
*9501 S. King Drive*
*Chicago, IL 60628*

Dr. Newaz,

With all do respect, no where in the student handbook does it say whether I can bring an attorney or not. Also you mentioned in the very first email that it's required to meet with the COP. The previous email you just sent stated that attending this meeting is optional. This is not adding up but I will see you tomorrow at 2:20

Sincerely,

Branden Gulla



 **Mohammad Newaz** <mnewaz@csu.edu>  May 17, 2020, 11:48 PM

to me

We invited you to the meeting, and It's required to meet the academic standing committee because your academic performance is not satisfactory. However, You may decline to participate. In either situation, the committee will decide based on the existing college policy.

College faculty do not communicate with or in the presence of an attorney unless the university attorney is present or instructed by them. The student handbook is for students and not for an attorney. Just to be sure, these communications are privileged and only meant for you.

Thank you.

Dr. Newaz

*Mohammad Newaz MD, Ph.D., FAHA*
*Interim Associate Dean, Academic Affairs*
*Professor of Physiology and Pharmacology*
*College of Pharmacy*
*Chicago State University*
*9501 S. King Drive*
*Chicago, IL 60628*

# *EXHIBIT "G"*

## *(To Plaintiff's Second Amended Complaint)*

**Appeals of a Professional Misconduct Decision by the College of Pharmacy Professionalism Committee**

The student may appeal the decision of the College of Pharmacy Professionalism Committee to the Dean within ten (10) working days following notification of the decision. The Dean's decision is final. Pending resolution of an appeal, the student's status as a student remains unaltered except in cases where there are reasons relating to the physical or emotional welfare of the student or of others, or reasons involving the safety of persons or property. The decision on student status will be made by the

33

Assistant/Associate Dean for Academic Affairs/Student Affairs depending on the nature of incidence.

Copies of all documents pertaining to the case will be entered into the student's permanent record and the permanent record of the College of Pharmacy Professionalism Committee after all University based appeals have been exhausted. No documents will be entered into the student's permanent record if the case against the student is found to be without merit.

If it is subsequently discovered that false information or evidence was provided by the student either prior to or during the hearing, regardless of whether the right to a hearing was waived, the case may be reopened and the Committee will reconsider the case based on the new information. In addition, the provision of false information or evidence will be considered an additional charge. To the extent possible, the original College of Pharmacy Professionalism Committee members will be retained on the reconvened Committee.

The College of Pharmacy Professionalism Committee may be called by the Dean to provide counsel on cases related to other academic issues of concern. In this event, the Committee's decision-making authority is suspended, and it serves solely in an advisory capacity to the Dean. Appeals for cases of non-academic misconduct will be directed to the College Grievance Committee for deliberation.

The College reserves the right to modify, deviate from, or make exceptions to this policy at any time, and to apply any such modification, or make any such deviation or exception applicable to any student without regard to date of application, admission, or enrollment. This policy is neither a contract nor an offer to enter into a contract. Each student is responsible for knowledge of the College's policies, as well as for changes promulgated by the College as addenda to this Policy. This policy supersedes all previous versions of the Student Professional Misconduct Policy. Any changes which are made in the **College's Student Handbook or University's Honor Code** will automatically be incorporated into this policy.

# *EXHIBIT "H"*

## *(To Plaintiff's Second Amended Complaint)*



# CHICAGO STATE UNIVERSITY

## Abilities Office of Student Services

Cordell Reed Student Union, Room #190

**Phone** (773)995-2380 **Fax** (773)995-3563

### <u>Accommodation Letter</u>

### <u>Status: Active</u>

| | |
|---|---|
| **Date:** | **February 8, 2021** |
| **UID:** | **900741302** |
| **Student Name:** | **Gulla, Branden** |

Dear Professor,

This letter is notification that the above-named student has registered with the Abilities Office of Student Services. The student has provided appropriate documentation of his/her disability to this office and is eligible to receive services in accordance with Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.

All information regarding a disability is confidential. Each student is encouraged to explain why an accommodation is needed; however, the student has the option not to disclose the specific disability.

The following accommodations are approved:

| Accommodation | Category | Description |
|---|---|---|
| Extended Test Time | Time | 2.0 (100% additional time) on timed-assignments, quizzes and tests |

Accommodations are required under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act. The purpose is to provide the student with an environment to obtain information and demonstrate mastery of information being tested by minimizing or eliminating the impact of the disability. **If any of the above academic adjustments results in a fundamental alteration of this course, please contact the Abilities Office at abilities@csu.edu or 773-995-2380.**

All information regarding a disability is confidential. Each student is encouraged to explain why an accommodation is needed; however, the student has the option not to disclose the specific disability.

| | |
|---|---|
| *Nicole Mathews* | *Branden Gulla* |
| | Branden Gulla (Feb 8, 2021 17:10 CST) |
| _____ | _____ |
| Service Provider | Student |

# Accommodation Letter.SPRING2021

**Final Audit Report** 2021-02-08

| | |
|---|---|
| Created: | 2021-02-08 |
| By: | Nicole Mathews (abilities@csu.edu) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAWr1MyAbzGv7wysfDS0r6YseNFr-j3Z5b |

## "Accommodation Letter.SPRING2021" History

Document created by Nicole Mathews (abilities@csu.edu)
2021-02-08 - 11:07:51 PM GMT- IP address: 99.125.160.45

Document e-signed by Nicole Mathews (abilities@csu.edu)
Signature Date: 2021-02-08 - 11:08:41 PM GMT - Time Source: server- IP address: 99.125.160.45

Document emailed to Branden Gulla (bgulla@csu.edu) for signature
2021-02-08 - 11:08:43 PM GMT

Email viewed by Branden Gulla (bgulla@csu.edu)
2021-02-08 - 11:09:13 PM GMT- IP address: 99.138.100.23

Document e-signed by Branden Gulla (bgulla@csu.edu)
Signature Date: 2021-02-08 - 11:10:31 PM GMT - Time Source: server- IP address: 99.138.100.23

Agreement completed.
2021-02-08 - 11:10:31 PM GMT

**Adobe Sign**

# *EXHIBIT*
# *"I"*
# *(To Plaintiff's Second Amended Complaint)*

**Branden Gulla** <bgulla@csu.edu>                    Tue, Feb 9, 2021, 3:00 PM

to Antoine, Vicky, Abilities

Hello Dr. Jenkins and Dr. Shah,

I hope you guys are doing well and staying warm. Attached is my accomodation form. I was told by the disabilities office to have my professors sign it and reply with "received and acknowledged."

Thank you,

Branden Gulla

---

**One attachment** • Scanned by Gmail ⓘ



📄 Accommodation ...

---

**Antoine Jenkins** <ajenki29@csu.edu>                    Tue, Feb 9, 2021, 3:33 PM

to me, Vicky, Abilities

Received and acknowledged.

•••

--

**Antoine T. Jenkins, Pharm.D., BCPS**

Clinical Associate Professor

# *EXHIBIT "J"*

## *(To Plaintiff's Second Amended Complaint)*

**College of Pharmacy**
9501 S. King Drive/DH 3070
Chicago, IL 60628
T 773.821.2782
F 773.821.2853

May 14, 2021

Branden Gulla
7224 Silver Leaf Ct
West Bloomfield, MI 48322-3334

Dear Branden Gulla:

As you are aware, you have previously been on Academic Probation for unsatisfactory academic performance in the Chicago State University College of Pharmacy. You received a letter on December 18, 2019 because you received a "D" grade in PHAR 6335 in Fall 2019 and were placed on Academic Warning. You received another letter from the Academic Standing Committee on May 18, 2020 because you earned an additional "D" grade in PHAR 6323, and continued on Academic Probation. In Spring 2021 you earned a "D" grade on your second attempt of PHAR 6323. Complying with the College policy, the Academic Standing Committee met on May 14, 2021, and discussed your continued unsatisfactory performance.

Following the College guidelines, the Committee determined that you are to be **dismissed** from the professional program in the College of Pharmacy. This means that you should NOT move forward with any additional courses and should not attend site for ProPrac VI. Please refer to your student handbook for additional information related to academic standing policies. Should you have any questions about this process, please contact Dr. Lalita Prasad-Reddy, Assistant Dean for Student Affairs or myself.

The decision of the Academic Standing Committee may be appealed to the Dean of the College of Pharmacy following the appeal procedure described in the Chicago State University College of Pharmacy student handbook. Should you have any questions about the appeal process, please contact me directly.

Sincerely,

Dr. Jeremy Hughes
Chair, Academic Standing Committee
Chicago State University. College of Pharmacy

Cc:     Dr. Matthew Fete, Dean
        Dr. Lalita Prasad-Reddy, Assistant Dean of Pharmacy Student Affairs
        Dr. Charisse Johnson, Assistant Dean, Office of Experiential and Continuing Professional Education
        Ms. Amalia Diaz, Program Director of Student Affairs (Student Records)



csu.edu

**College of Pharmacy**
9501 S. King Drive/DH 3070
Chicago, IL 60628
T 773.821.2782
F 773.821.2853

